TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN S. GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2426
     Facsimile: (213) 894-0142
     E-mail:    Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ANY AND ALL FUNDS SEIZED FROM VARIOUS ACCOUNTS AT BANK OF AMERICA, N.A.,<br><br>    Defendant. | NO. 2:22-cv-00826<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. § 981(a)(1)(C)<br><br>[U.S.D.S.S.] |

   The United States of America brings this claim against the defendant any and all bank funds seized from the Bank of America accounts identified in Attachment A, and alleges as follows:

**INRODUCTION**

1. For at least three years, criminal actors known and unknown have conspired to open hundreds of bank accounts at Bank of America ("BofA") through corruption and bribery of bank employees responsible for ensuring BofA's compliance with anti-money laundering and customer identification policies during new account openings, thus providing hundreds of unknown or unverified individuals or organizations with virtually-unfettered access to the U.S. financial system. Through this civil complaint for forfeiture, the government seeks to forfeit the proceeds of this scheme, in the form of the funds seized from these fraudulently-opened accounts.

**JURISDICTION AND VENUE**

2. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C).

3. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355.

4. Venue lies in this District pursuant to 28 U.S.C. § 1395(a).

**PERSONS AND ENTITIES**

5. The plaintiff is the United States of America (the "plaintiff" or the "government").

6. The defendants are any and all bank funds (the "Defendant Funds") seized from the BofA accounts specified in Attachment A (the "Defendant Accounts").

7. The Defendant Funds are currently held by the United States Marshals Service where they shall remain subject to this Court's jurisdiction pending the resolution of this action.

8. The interests of BofA as well as the purported accountholders[1] identified in Attachment A may be adversely affected by these proceedings.

### BASIS FOR FORFEITURE

*Background on Currency Control Restrictions and Informal Value Transfer Systems*

9. The laws of the People's Republic of China (the "PRC") place certain limitations on the amount of currency PRC citizens or businesses may transfer out of the PRC in any calendar year.

10. Despite these capital controls, large numbers of PRC citizens and businesses regularly seek to transfer funds out of the PRC and often to the United States, in amounts not permitted by PRC law, for purposes both legal and illegal.

11. PRC citizens and businesses use a variety of methods to circumvent PRC capital controls, and many of these methods require domestic bank accounts to receive and spend these transferred funds.

12. One method PRC citizens use to transfer funds while evading PRC capital controls is the transfer of funds from currency exchanges in the PRC, and specifically in Hong Kong, to bank accounts at domestic U.S. banks. This method is possible based on differences between currency control regulations in Hong Kong and the PRC generally. To execute these transfers, the transferring party will often need to have a preexisting account at the domestic U.S. bank.

---

[1] As described herein, a cooperating defendant has admitted that most of these Defendant Accounts were never verified, and as such, there is no way to presently confirm whether the identified accountholders are, in fact, the persons controlling the Defendant Accounts. Accordingly, these individuals are referred to herein as "purported accountholders."

3

13. Another method PRC citizens use to transfer funds while evading PRC capital controls is through informal value transfer systems ("IVTS"), commonly known as "hawala" systems. IVTS are a method of unregulated and/or illegal transfers of value which do not utilize formal or conventional banking channels. In an IVTS transfer, neither currency nor assets are actually transferred, but instead, a payment to one party by a customer creates debt to be paid to that customer by a separate third party, typically in another jurisdiction. Functionally, an IVTS transaction typically occurs as follows: a customer transfers an amount of money to a local IVTS operator, who then directs an IVTS associate located in a foreign country or jurisdiction to pay an equivalent amount in foreign currency to the customer's designated foreign account, minus the IVTS operator's fees. In this way, no currency or funds cross any borders, but the customer is now in possession of funds in an account in the foreign jurisdiction with no record of any international transfer having taken place.

14. IVTS systems are common in multiple parts of the world, including in China, where they are commonly referred to as "fei chien" or "flying money," and are used to circumvent PRC currency control restrictions.

15. When transferring funds through an IVTS in order to evade PRC capital controls, the transferring party will often need a U.S. bank account to receive and spend the transferred funds, either to receive funds from the ITS associate, or to conduct ordinary banking activity and spend these funds. This activity may include purchasing real property or investments, which may be complicated in the absence of a U.S. bank account.

4

16. Because IVTS transactions occur without any formal record of any currency or funds transfer, IVTS operations are often used for criminal purposes, as IVTS transactions may frustrate law enforcement's ability to trace the proceeds of criminal activity. In addition, because IVTS operations require large amount of currency outside of the traditional banking system to satisfy customer requests, IVTS operations are regularly used as a method to launder the cash proceeds of fraud schemes or narcotics sales.

*Background on Federal Anti-Money Laundering Laws and Know-Your-Customer Law and Regulations*

17. BofA is a federally-insured financial institution within the meaning of federal law.

18. BofA maintains branches throughout this judicial district.

19. In accordance with federal regulations, BofA maintains Anti-Money Laundering and Customer Identification Policies (the "AML-CIP Programs") which impose certain requirements on BofA and its employees when opening new bank accounts.

20. Specifically, 31 C.F.R. § 1020.220 (previously at 31 C.F.R. § 103.121) requires that banks such as BofA implement risk-based procedures for "verifying the identity of each customer to the extent reasonable and practicable" in order to "enable the bank to form a reasonable belief that it knows the true identity of each customer." With respect to non-resident aliens applying for an account, banks such as BofA must obtain and verify a passport number and country of issuance (or similar identification information) and create procedures to address situations where such a customer seeks to open an account without appearing in person at the bank, and where

5

circumstances increase the risk that the bank will be unable to verify the true identity of the customer through documents alone.

21. BofA complies with 31 CFR § 1020.220 through, among other things, implementation and enforcement of the AML-CIP Programs.

22. At all relevant times, the AML-CIP Programs required BofA employees opening new bank accounts to ensure that new, non-resident alien applicants ("NRA Applicants") provide an original, acceptable identification document (which may include a valid passport) as well as their physical residency information within the United States; and also, that such accounts be opened only for owners or signers who are present, in person, at a BofA financial center or bank-approved offsite event.

23. BofA's AML-CIP Programs included a specific requirement that employees opening new accounts for NRA Applicants verify each new NRA account holder's physical address.

24. Because the AML-CIP Programs are mandated by federal regulations, satisfaction of these requirements is critical to BofA's compliance with federal law. BofA will not open an account for an NRA individual in the absence of compliance with 31 CFR § 1020.220 and the AML-CIP Programs.

25. BofA employees' compliance with the AML-CIP Programs was material to BofA, and employees responsible for account openings were regularly trained on these AML-CIP Programs and are required to periodically certify their understanding of the same.

*BofA Bankers Evaded the AML-CIP Programs to Open the Defendant Accounts using False Information*

26. Zhenyi QI, Thuan LE, Chi "Maggie" ZHANG, and Kejia REN are former employees of BofA in this district.

27. Beginning no later than 2019, substantial numbers of non-resident aliens, primarily located in the PRC, sought to open domestic bank accounts, but were unable or unwilling to do so in accordance with the AML-CIP Programs (the "PRC Applicants").

28. In order to open bank accounts for these PRC Applicants, persons known and unknown, including Xiang "Hugh" GAO and Lina WANG, conspired to corrupt bankers, including at BofA, in order to open bank accounts for PRC Applicants while circumventing the AML-CIP Programs (the "Account Brokers").

29. The Account Brokers' scheme generally operated in the following manner:

   a. PRC Applicants would contact one or more Account Brokers, directly or indirectly, in order to open a domestic bank account for the applicant without appearing at a local bank branch or undergoing customer verification in accordance with 31 CFR § 1020.220.

   b. The PRC Applicants would provide the Account Brokers with scanned copies of passports, purportedly for the PRC Applicants (the "PRC Passports"), to be used to open the desired account.

   c. The Account Brokers did not verify that these PRC Passports were accurate, or even if the PRC Applicant was actually the person identified in the passport. In some instances, these PRC Passports were stolen or forgeries which purported to be for a PRC citizen seeking to open a bank account, but which actually bore passport identification information associated with unrelated persons from counties other than the PRC.

   d. The Account Brokers would solicit bankers with account-opening authority in the Southern California region,

7

promising them either cash compensation for opening accounts for the PRC Applicants, or in other cases, by promising a stream of new accounts for the banker sufficient to increase such a banker's account-opening bonuses under a bank's internal compensation systems.

   e. The Account Brokers would pass images of the PRC Passports on to a corrupted banker, who would then open a bank account without verifying the purported accountholder's identity or supporting documents, such as the PRC Passports.

   f. In order to circumvent AML-CIP Programs, the Account Brokers would not use the PRC Applicant's actual residency address, but instead, would identify a domestic address the Account Brokers or their agents controlled as the PRC Applicant's residential address in the bank's books and records.

   g. Once the account was opened, the bank would then mail banking cards for the new account to the false address submitted by the Account Brokers, who would directly or indirectly collect these cards and transfer them to the PRC Applicant, who could then conduct any banking transactions remotely.

 30. The Account Brokers corrupted numerous BofA bankers during the execution of this scheme, four of whom are identified herein:[2]

<em>Banker Number 1 – ZHANG</em>

 31. One BofA banker assisting the Account Brokers, and specifically GAO, in executing this scheme was ZHANG, who was at that time an employee of BofA.

---

[2] These four bankers identified herein (ZHANG, QI, LE, and REN), are presented merely as examples of this scheme's operation, and do not represent a comprehensive list of bankers in this region, or even at BofA, corrupted by this scheme.

8

32. ZHANG would primarily assist the Account Brokers by acting as a domestic intermediary for GAO and/or WANG and identifying and managing other BofA bankers who ZHANG believed would be susceptible to corruption.

33. In some instances, ZHANG would personally open certain of the Defendant Accounts using false residency information. ZHANG opened at least four such accounts for PRC Applicants by falsely identifying the purported accountholder's residential address as an address in La Puente, California, when in fact, the actual resident of that address had no association with any Defendant Accounts, denied knowing ZHANG or GAO, and handed over to investigating agents mail from BofA received at that address, while denying knowing the identified recipients of the mail.

*Banker Number 2– QI*

34. A second BofA banker corrupted through the above-described scheme was QI.

35. QI was a BofA relationship manager at a BofA branch in Rosemead, California.

36. In or about 2019, QI was approached by ZHANG, operating on behalf of GAO, WANG, and the Account Brokers. Through ZHANG, the Account Brokers proposed to pay QI approximately $200 per account he opened at BofA for one of the PRC Applicants in violation of the AML-CIP Programs.

37. QI agreed to this proposal, and GAO directed QI to open accounts for the PRC Applications using false addresses, in order to evade BofA's AML-CIP Programs.

38. At that time, QI knew that the AML-CIP Programs and federal regulations prohibited opening accounts using false or "drop"[3] addresses, and that he knew the address information he was entering into BofA's books and records were false.

39. GAO and ZHANG would forward copies of the NRA Passports to defendant QI in order to open accounts for the NRA Applicants in contravention of the AML-CIP Program.

40. Using the Alipay electronic payment application, GAO and/or other Account Brokers would pay QI the agreed-upon amount for each BofA account QI opened for a PRC Applicant while evading the AML-CIP Programs.

41. QI would open accounts for which the PRC Applicants were the purported accountholders and signers on the accounts, but without requiring that PRC Applicants (or anyone at all) be present, in person, at a financial center or bank-approved offsite events, in violation of the AML-CIP Programs. Accordingly, no effort was made to verify who may or may not have actually controlled the accounts, nor whether the identification documents provided by ZHANG and/or GAO were authentic or used without permission.

42. QI would fund these new accounts with money orders provided by GAO and/or ZHANG, as BofA policy required additional identification for new accounts initially funded by cash, but not for those funded by money orders.

---

[3] A "drop" address is an address falsely identified as a residence or permanent location, but in fact, is just used for a short period of time or for a specific or limited purpose, which often cannot be traced back to the drop address user. Because drop addresses provide anonymity and may frustrate law enforcement investigations, drop addresses are often used by criminals to receive mail or parcels while hiding their true location or identity.

10

43. Once such an account was opened, BofA would mail the relevant banking cards to the address QI had listed, and QI would retrieve the cards and either pass them on to the Account Brokers, or in other cases, ZHANG, GAO, or other Account Brokers would collect the cards from the address they had identified for QI.

44. QI would receive instructions from the Account Brokers, including GAO and ZHANG, by text message or through the WeChat application.

45. After opening a substantial number of accounts for the PRC Applicants, QI began to receive PRC Passports and instructions from WANG directly, instead of through ZHANG and/or GAO.

46. QI received at least $90,000 from the Account Brokers as part of this scheme.

47. On or about May 6, 2021, QI pled guilty pursuant to a plea agreement to one count of conspiracy to violate 18 U.S.C. §§ 371 1005 (false entry in bank records) in United States v. Zhenyi Qi, C.D.Cal Case No. 21-cr-200-RGK.

*Banker Number 3 – LE*

48. A third BofA banker corrupted through the above-described scheme was LE.

49. LE was previously a BofA employee at BofA's Rosemead, California branch.

50. LE aided QI in opening at least 20 Defendant Accounts by inputting false residency information into BofA's books and records in order to evade the AML-CIP Programs.

51. LE provided his BofA credentials to QI so that QI could open certain of the Defendant Accounts, and in return, LE received

account opening credit under BofA's internal compensation system, as well as gifts from QI.

52. On or about November 8, 2021, LE pled guilty pursuant to a plea agreement to one count of violating 18 U.S.C. § 1005 (false entry in bank records) in <u>United States v. Thuan Le</u>, C.D.Cal Case No. 21-cr-32-DSF.

*Banker Number 4 – REN*

53. A fourth such banker was REN, who was previously a BofA employee at BofA's Puente Hills, California branch.

54. In interviews with investigating agents, REN admitted that he had opened several BofA accounts for the PRC Applications in breach of the AML-CIP Programs and using false information, and without the purported accountholders being present in the BofA branch, and that he knew the purported accountholders were in China and were not residents of the US.

55. REN received the relevant PRC Passports from ZHANG, who would bring REN copies of PRC Passports for him to use to open associated accounts.

56. REN admitted to receiving approximately $200 in cash from ZHANG for this service, and stated that he mainly opened the associated accounts in order to make his sales goals and to receive increased bonuses.

57. REN admitted to opening at least 21 accounts falsely using the Nogales Address (as defined herein), and without verifying the purported accountholders documents or identities.

*The Defendant Accounts Were Each Opened Using False Residence Information in Order to Evade the AML-CIP Programs*

58. Each of the Defendant Accounts was opened by evading or defeating the AML-CIP Programs. Specifically, each of the Defendant Accounts were opened by identifying a false residential addresses for the purported accountholder in BofA's books and records (the "False Addresses"). In fact, each of the False Addresses was a mailbox or designated mail drop controlled by the Account Brokers, either directly or indirectly, rather than the actual residence of the purported accountholder.

59. The False Addresses included:

   a. A commercial mail stop located in Arcadia, California (the "Duarte Road Address").[4] Under 31 CFR § 1020.220 and interpretive guidance of the same, commercial mail stops are not permitted as residency addresses for foreign nationals when opening a U.S. bank account. When interviewed, the owner of the Duarte Road Address stated that she received large amounts of mail from various banks for people with Chinese names that were not her customers and did not rent mailboxes from her business, and requested that the U.S. Postal Service remove large amounts of such mail as abandoned. Following his arrest, QI admitted that he falsely entered the Duarte Road Address in BofA's books and records when opening these accounts, and stated that WANG had told him that she knew the owner of Duarte Road Address, and that whenever BofA banking cards would come in the mail to this address, they could be forwarded to Beijing, China.

   b. A commercial mail stop located in Rowland Heights, California (the "Nogales Street Address"). Following his arrest, QI admitted that he falsely entered the Nogales Street Address in BofA's

---

[4] All addresses identified herein are redacted pursuant to L.R. 5.2-1.

13

books and records when opening these accounts, and that he received the address from ZHANG, knowing that it was a commercial mailbox facility, and thus not the actual residence of any purported accountholders.

        c.   A residence located in Rosemead, California (the "Eckhart Avenue Address"). That address is the front unit of a multi-unit building, and is approximately 800 square feet in size. Queries to both commercial and law enforcement databases reflect that none of the purported accountholders of the Defendant Accounts who identified the Eckhart Avenue address as their place of residency address actually lived there. Following his arrest, QI admitted that he falsely entered the Eckhart Avenue Address in BofA's books and records when opening these accounts, and that the occupant of the Eckhart Avenue Address was a family friend of his who agreed to let QI use the address for other Chinese clients not in the country.

        d.   A residence located in San Marino, California (the "Sherwood Address"). The residents of the Sherwood Address were associates of QI, and when interviewed, denied knowing any of the names associated with the Defendant Accounts, but admitted that some of the named accountholders had received mail at that address, which would be retrieved by QI.

        e.   A residence located in La Puente, California (the "Covina Address"). The resident of this address stated that they had no association with ZHANG, QI, or GAO, and denied recognizing the photographs of the same. The resident attempted to abandon BofA mail received at that address to investigating agents and denied knowing the addressees of the mail.

    f. A residence located in El Monte, California (the "Lambert Address"). Following his arrest, QI admitted that he falsely entered the Lambert Address in BofA's books and records when opening these accounts, and that the occupant of the Lambert Address was a customer of his who was renting the house and agreed to let QI use the address for other Chinese clients not in the country.

    g. A commercial mailbox facility located in Rowland Heights, California (the "Colima Address"). Following his arrest, QI admitted that he falsely entered the Colima Address in BofA's books and records when opening these accounts, and that he received the address from ZHANG, knowing that it was a commercial mailbox facility, and thus not the actual residence of any purported accountholders. According to a rental contract disclosed by the owner of the facility, the relevant address was a commercial mailbox rented by GAO.

    h. A residence located in Rosemead, California (the "Rio Hondo Address"). Following his arrest, QI admitted that he falsely entered the Rio Hondo Address in BofA's books and records when opening these accounts, and that the occupant of the Rio Hondo Address was a former customer of his who was renting the house and agreed to let QI send and collect mail at that address.

    i. A commercial mailbox facility located in San Gabriel, California (the "Valley Address"). Following his arrest, QI admitted that he falsely entered the Valley Address in BofA's books and records when opening these accounts, and that he received the address

15

from ZHANG knowing that it was a non-qualifying address and commercial mailbox facility, and thus not the actual residence of any purported accountholders.

  j. A residence located in Alhambra, California (the "Edgewood Address"). Following his arrest, QI admitted that he falsely entered the Edgewood Address in BofA's books and records when opening these accounts, and that the occupant of the Edgewood Address was a former customer of his who was renting the house and agreed to receive mail for QI at that address.

  k. A residence located in Covina, California (the "Tangerine Address"). Following his arrest, QI admitted that he falsely entered the Tangerine Address in BofA's books and records when opening these accounts, and that the occupant of the Tangerine Address was a customer of his who was renting the house, and QI had asked him if he could use the address for his other Chinese clients not in the US.

  l. A package forwarding business located in Rowland Heights, California (the "Colima Address 2"). The owner of the business at the Colima Address 2 stated to investigating agents that the business regularly received mail from BofA for various individuals not associated with their business.

  m. Two mailbox businesses located in Monterey Park, California (the "Garvey Addresses"). The manager of the business at the Garvey Addresses stated they had moved their mail forwarding business in approximately January of 2020 and did not know QI, ZHANG

16

or GAO and denied recognizing their photographs, and stated a suspicion that persons receiving mail at the Garvey Address might be committing fraud, based on unassociated or unregistered persons receiving mail at the Garvey Addresses.

//

//

//

**CLAIM FOR RELIEF**

18 U.S.C. § 981(a)(1)(C)

60. Based on the facts set out above, Plaintiff alleges that the Defendant Funds constitute or are derived from proceeds traceable to violations of, or one or more conspiracies to commit violations of, 18 U.S.C. §§ 1005 (false entries in bank records), 1343 (wire fraud), and 1344 (bank fraud), and the latter two statutes are specified unlawful activity as defined in 18 U.S.C. §1966(c)(7)(A) and 1961(1). The Defendant Funds are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the Defendant Funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: February 7, 2022

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN S. GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section


 /s/
DAN G. BOYLE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

VERIFICATION

I, LUIS OROZCO, hereby declare that:

1. I am a Special Agent of the United States Diplomatic Security Service and the case agent for the forfeiture matter entitled <u>United States of America v. Any and All Funds Seized from Various Accounts at Bank of America, N.A.</u>

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 2, 2022 in Los Angeles, California.

_____
LUIS OROZCO
Special Agent- United States
Diplomatic Security Service

20